**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CUSHMAN & WAKEFIELD U.S., INC.,

                                    Plaintiff,

v.

MICHAEL SACLARIDES and DEVIN
BRYAN,

                                    Defendants.

---

**Civil Action:** 1:24-cv-00913

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Cushman & Wakefield U.S., Inc. ("Cushman & Wakefield"), by and through its

undersigned counsel Kelley Drye & Warren LLP, as and for its Complaint against defendants

Michael Saclarides ("Saclarides") and Devin Bryan ("Bryan," and together with Saclarides,

"Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      Cushman & Wakefield brings this action for a preliminary and permanent

injunction and damages for breach of contract and misappropriation of trade secrets arising from

Saclarides' and Bryan's (i) misappropriation of hundreds of files containing trade secret and

confidential information belonging to Cushman & Wakefield, (ii) breach of their obligation not

to solicit Cushman & Wakefield's clients and referral sources, (iii) breach of their obligation not

to solicit Cushman & Wakefield's employees, and (iv) breach of their obligation not to use

Cushman & Wakefield's trade secret and confidential information.

2.      Saclarides and Bryan are brokers formerly engaged by Cushman & Wakefield in

its Multifamily Advisory Group, which provides investment services in the multifamily real

estate market in the Sunbelt region and elsewhere. In their capacity as brokers, Saclarides and

Bryan had access to Cushman & Wakefield files that contain trade secret and confidential

information and which are the product of the company's extensive research, development, and investment of time and effort. Such files include proprietary underwriting models, pitch templates, business development pipelines, client lists, and compilations of financial information.

3.     Cushman & Wakefield takes steps to protect these files and the information they contain—and to protect itself against unlawful competition. Among other things, brokers exposed to trade secret and confidential information are required to execute agreements that contain confidentiality and non-solicitation obligations. That is exactly what Cushman & Wakefield did with Saclarides and Bryan. In connection with their engagement as brokers, Cushman & Wakefield required Saclarides and Bryan to execute Broker Agreements that prohibit them from soliciting clients, referral sources, and employees of Cushman & Wakefield for a period of one year after the termination of their engagement and from misusing the company's trade secret and confidential information.

4.     Saclarides and Bryan both resigned from Cushman & Wakefield on December 29, 2023, within hours of one another. On or about that date, the company learned that they both had accepted positions with Walker & Dunlop, Inc., a competitor of Cushman & Wakefield in the multifamily real estate market ("Walker & Dunlop"). Saclarides and Bryan both assured management at Cushman & Wakefield that they would abide by their non-solicitation obligations. Bryan specifically promised that he would not take any files related to the Multifamily Advisory Group.

5.     Defendants' representations were false. Saclarides and Bryan immediately began violating their contractual obligations under the Broker Agreements—not to mention federal and state law. On December 29th, the day of Defendants' resignation, Saclarides began soliciting Cushman & Wakefield employees to join him at Walker & Dunlop. Moreover, Cushman &

Wakefield later learned that even ***prior*** to his resignation and continuing thereafter, Saclarides solicited Cushman & Wakefield clients to do business with Walker & Dunlop. Bryan aided Saclarides in those efforts.

6.     Worse still, Cushman & Wakefield later learned that Bryan connected a USB device to his company laptop on December 29th (again, the day of Defendants' resignation) and copied hundreds of files containing trade secret and confidential information. Upon information belief, this copying—in violation of both his contractual obligations and statute—was done in coordination with Saclarides. Indeed, the stolen files relate to some of the ***same clients*** whose business Saclarides attempted to poach for Walker & Dunlop before and after Saclarides' resignation from Cushman & Wakefield. Saclarides and Bryan knew the business they wanted to target and Bryan picked the files to help them both do that.

7.     Upon information and belief, Saclarides and Bryan are using Cushman & Wakefield's trade secret and confidential information to compete against it.

8.     To prevent further erosion of its customer relationships, employee relationships, goodwill, and proprietary information, Cushman & Wakefield seeks preliminary and permanent injunctive relief to enjoin Saclarides' and Bryan's unfair and illegal competition, and seeks damages.

## **THE PARTIES**

9.     Cushman & Wakefield is Missouri corporation with its principal place of business located at 225 West Wacker, Chicago, Illinois.

10.     Upon information and belief, Saclarides is a resident of North Carolina, with an address at 2916 Sunset Drive, Charlotte, North Carolina.

11.     Upon information and belief, Bryan is a resident of North Carolina, with an address at 4133 Leeds Drive, Charlotte, North Carolina.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 with respect to Cushman & Wakefield's claims brought under the Defend Trade Secrets Act, 18 U.S.C. § 1836(c), and pursuant to 28 U.S.C. § 1367 with respect to Cushman & Wakefield's claims brought under state law.

13.     This Court has personal jurisdiction over Saclarides and Bryan and venue is proper in this judicial district because both Broker Agreements incorporate by reference a mandatory forum selection clause that states: "Any suit, action or other legal proceeding arising out of or relating to this Policy shall be brought exclusively in a court of competent jurisdiction in the State of New York and within New York County."

## FACTUAL BASIS OF THE CLAIMS

**A.     Cushman & Wakefield's Business And The Multifamily Real Estate Industry**

14.     Cushman & Wakefield is one of the largest commercial real estate firms in the United States. Among other things, Cushman & Wakefield's business includes a Multifamily Advisory Group that delivers investment advice, transaction execution strategies, and market information to owners and investors who buy, sell, finance, and develop multifamily real estate in the Sunbelt region and across the United States.

15.     The Multifamily Advisory Group in the Sunbelt region is made up of approximately 100 individuals employed or otherwise engaged by Cushman & Wakefield and is where Saclarides and Bryan worked during their engagement.

16.     The Multifamily Advisory Group relies on proprietary financial and execution models to help clients maximize market exposure when selling their assets. These financial and execution models are generated through substantial time, effort and expense by Cushman & Wakefield and its employees and brokers.

17.     Cushman & Wakefield's financial and execution models contain trade secret and confidential information and are only shared with staff members who require the information to perform their job functions, such as brokers. Brokers are also privy to other trade secret and confidential information such as financial and pricing information, pitch materials, marketing materials, and client lists—all of which helps them solicit new business for Cushman & Wakefield and maintain Cushman & Wakefield's existing clients. This information, too, is only shared with staff members who require it to perform their job functions.

18.     Cushman & Wakefield takes a number of other steps to protect its trade secret and confidential information. It requires employees and brokers to execute agreements containing confidentiality obligations that prohibit the disclosure or use of trade secret or confidential information other than as necessary in the performance of their job. Cushman & Wakefield also executes non-disclosure agreements with clients and prospective clients.

19.     Cushman & Wakefield further requires that its employees and brokers use password protected computers and limits who within the company can access files that contain commercially sensitive information.

20.     The market for commercial real estate advisory services in the multifamily sector is highly competitive. Cushman & Wakefield is often competing with other firms for the same clients. One such competitor is Walker & Dunlop—another large commercial real estate firm that operates in the multifamily sector in the sunbelt region and across the United States.

Cushman & Wakefield relies on the relationships it has developed with existing clients and referral sources over the years and its confidential financial and execution models to maintain and expand its client base and distinguish itself from competitors such as Walker & Dunlop.

21.     By virtue of their engagement, brokers such as Saclarides and Bryan and other employees of Cushman & Wakefield forge relationships with Cushman & Wakefield's clients. These relationships enable brokers and employees to understand the needs of the clients and how Cushman & Wakefield—or a competitor such as Walker & Dunlop—can best solicit the clients and maintain their business.

22.     Similar to its client relationships, Cushman & Wakefield's relationships with its employees and brokers is a valuable asset of the company. Cushman & Wakefield expends substantial resources on recruiting and retaining its employees and brokers—and the market to do so is likewise highly competitive. Cushman & Wakefield also invests substantial resources to train its employees and brokers in all facets of its business, including deal management, sales, and marketing. Due to this investment, Cushman & Wakefield's employees and brokers develop valuable skills, gain industry knowledge, and develop client relationships—all of which make them attractive candidates and potential assets to competitors such as Walker & Dunlop.

**B.     Bryan's Engagement With Cushman & Wakefield And Restrictive Covenant Obligations**

23.     On or about January 14, 2019, Bryan began working for Cushman & Wakefield as an Analyst in the Multifamily Advisory Group. He was promoted to Associate in 2023 and continued in that role until his resignation at the end of the year.

24.     In connection with his promotion to Associate, Bryan executed a Section 3508 Broker Salesperson Agreement on January 23, 2023, pursuant to which he became engaged as a broker ("Bryan Broker Agreement").

25.     Section 7(a) of the Broker Agreement requires Bryan to comply at all times with certain confidentiality and nonsolicitation obligations set out in Cushman & Wakefield's Confidentiality and Non-Solicitation Policy ("Policy"). In particular, Section 7(a) of the Broker Agreement states:

> During the Term[1] and thereafter, Broker agrees to comply at all times with C&W's then current Confidentiality and Non-Solicitation Policy, including, but not limited to, the restrictions set forth therein with respect to (i) confidentiality and 'Confidential Information'; (ii) soliciting or encouraging any employee or independent contractor of C&W or any of its subsidiaries or affiliates to terminate their employment/engagement with C&W; [and] (iii) soliciting or otherwise interfering with the business or patronage of any 'Active Client or 'Referral Source'[.]

26.     The Policy is enclosed in the Bryan Broker Agreement as Exhibit B. Paragraph (a) of the Non-Solicitation section in the Policy restricts Bryan from soliciting Cushman & Wakefield's "active clients" and "referral sources" for a period of twelve months following the termination of Bryan's engagement, on the following terms:

> [Bryan shall not without the prior written consent of Cushman & Wakefield] … solicit business from any Active Clients or Referral Sources (as each term is defined below) that have existing or pending transactions or assignments with Cushman & Wakefield or any its affiliates or solicit or encourage such Active Clients to discontinue or reduce their existing or pending transactions or assignments with Cushman & Wakefield or reduce their consideration of Cushman & Wakefield for pending transactions or assignments, personally or as an employee, stockholder, director, investor, owner, consultant, manager, member, associate, partner, agent,

---

[1] Section 5 of the Bryan Broker Agreement defines "Term" as the period of time from January 23, 2023 until termination upon written notice from Cushman or upon 14 days' written notice from Mr. Bryan.

independent contractor, or otherwise, or by means of any corporate or other device (it being understood that this restriction shall not prohibit Employee's ability to accept or respond to unsolicited calls or contacts, including, accepting or responding to requests for proposals, requests for quotations, or other solicitation made by those individuals or entities referenced in this paragraph). This restriction applies only to any Active Client or Referral Source with whom the Employee had contact or about whom he/she learned of through Confidential Information during the last twenty-four (24) months of his/her employment or other relationship with Cushman & Wakefield.

27.     The Policy defines "active client" to mean "any person or entity for which, within the twelve (12) months immediately preceding the termination of Employee's employment or other relationship with Cushman & Wakefield, Cushman & Wakefield either is performing or has performed, brokerage, management, leasing, consulting, financial or any services pursuant to an agreement (other than a brokerage agreement incidental to an individual sale or leasing transaction) or with which Cushman & Wakefield is negotiating such an agreement or potential agreement at the time of the Employee's termination of employment or other relationship with Cushman & Wakefield."

28.     The Policy defines "referral source" to mean "any person or entity that, within the twelve (12) months immediately preceding the Employee's termination of employment or other relationship with Cushman & Wakefield, referred actual or potential business or clients to Cushman & Wakefield."

29.     Paragraph (b) of the Non-Solicitation section in the Policy restricts Bryan from soliciting Cushman & Wakefield employees for a period of twelve months following the termination of Bryan's engagement, on the following terms:

> [Bryan shall not without the prior written consent of Cushman & Wakefield] … [s]olicit or encourage any officer, director, employee, consultant, agent or independent contractor employed or exclusively retained by Cushman & Wakefield or any of its affiliates to leave the employ or exclusive engagement of Cushman & Wakefield or any of Cushman & Wakefield's affiliates, other than through a general solicitation that does not specifically target any such person. The non-solicitation provisions set forth herein shall not apply to individuals who worked, or were otherwise affiliated, with Employee or were part of Employee's team prior to the commencement of Employee's employment or other relationship with Cushman & Wakefield.

30.     The Bryan Broker Agreement and the Policy incorporated by reference in the Broker Agreement also protect trade secret and confidential information belonging to Cushman & Wakefield.

31.     First, the Policy prohibits Bryan from disclosing trade secret or confidential information belonging to Cushman & Wakefield and from using such information other than in connection with Bryan's work on behalf of Cushman & Wakefield. The Policy specifies such information to include, among other things, information about business operations, business plans, business methods, pricing, sales, marketing, costs, and existing and prospective Cushman & Wakefield clients, including information about clients' purchasing patterns and the terms and conditions of any contractual relationship.

32.     Second, Section 8 of the Bryan Broker Agreement requires that Bryan return to Cushman & Wakefield upon termination of his engagement all Cushman documents in his possession or control, including documents that reflect confidential information and documents that are stored electronically. That requirement is then reiterated in the Policy.

33.    Mr. Bryan worked out of Cushman & Wakefield's North Carolina offices at all times during his engagement with the Company.

**C.    Saclaride's Engagement With Cushman & Wakefield And Restrictive Covenant Obligations**

34.    On or about April 19, 2021, Saclarides began working for Cushman & Wakefield as a Senior Director in the Multifamily Advisory Group. He continued in that role until his resignation from Cushman & Wakefield at the end of 2023.

35.    Also on April 19, 2021, Saclarides executed a Section 3508 Broker-Salesperson Agreement, pursuant to which he became engaged as a broker ("Saclarides Broker Agreement").

36.    Section 8(c) of the Saclarides Broker Agreement mirrors Section 7(a) of the Bryan Broker Agreement in that it requires Saclarides to comply at all times with the company's Confidentiality and Non-Solicitation Policy:

> You shall comply at all times with C&W's then current Confidentiality and Non-Solicitation Policy, including but not limited to the restrictions set forth therein with respect to soliciting or (i) encouraging any employee or independent contractor of C&W or any of its subsidiaries or affiliates to terminate their employment/engagement with C&W or (ii) otherwise interfering with the business or patronage of any "Active Client" (as defined in said Policy).

37.    The Confidentiality and Non-Solicitation Policy in effect in April 2021 is the same Policy enclosed as Exhibit B to the Bryan Broker Agreement and thus Saclarides is subject to the same non-solicitation and confidentiality obligations as Bryan, described in ¶¶ 25–32, *supra*.

38.    Section 8(c) of the Saclarides Broker Agreement further states that Saclarides may retain documents only "subject to C&W's [Cushman & Wakefield's] reasonable approval"

and that "in no event shall [he] be entitled to retain or utilize any C&W proprietary information subsequent to [his] termination." Again, a similar restriction exists in the Policy. *See* ¶ 32, *supra*.

39.     Like Bryan, Saclarides worked out of Cushman & Wakefield's North Carolina offices at all times during his engagement with the Company.

**D.     Defendants' Resignations From Cushman & Wakefield**

40.     In a conversation on December 29, 2023, Saclarides informed Cushman & Wakefield Managing Principal Brett Gray that he was resigning from the company and had accepted a position at Walker & Dunlop. Saclarides assured Gray that he intended to uphold his non-solicitation obligations.

41.     Saclarides sent an email containing his resignation letter at 12:31 p.m. Four hours later, at 4:35 p.m., Bryan sent an email also resigning from Cushman & Wakefield.

42.     Gray spoke to Bryan about his resignation on January 2, 2024. At that time, Bryan advised Gray that he would be joining Saclarides at Walker & Dunlop. Bryan assured Gray that he would abide by his non-solicitation obligations. Gray reminded Bryan that he was not to take any files relating to Cushman & Wakefield's Multifamily Advisory Group. Bryan responded, "Absolutely," confirming that he understood his confidentiality obligations to the company.

43.     On January 5th, Gray issued notices of termination to Saclarides and Bryan that (again) reminded them of their non-solicitation and confidentiality obligations under their respective Broker Agreements.

44.     In a press release issued on January 11th, Walker & Dunlop announced the expansion of its multifamily sales team with the addition of Saclarides as a managing director and Bryan as a director.[2]

**E.     Defendants' Violation of their Contractual Obligations and Misappropriation of Cushman & Wakefield's Trade Secret and Confidential Information**

45.     Cushman & Wakefield has since learned that Saclarides and Bryan began to violate their contractual obligations to the company even before ink was dry on their resignations—if not sooner. Cushman & Wakefield has also since learned that Bryan stole hundreds of company files containing trade secret and confidential information. Upon information and belief, this was a coordinated effort with Saclarides. Indeed, it is obvious that Defendants selected the stolen files because they would inflict the maximum competitive damage on Cushman & Wakefield while at the same time providing Defendants and Walker & Dunlap with a significant competitive advantage.

**(a)     Defendants' Solicitation of Cushman & Wakefield Employees**

46.     At or around the time of his resignation, Saclarides set the wheels in motion to poach Cushman & Wakefield employees for Walker & Dunlop.

47.     Sometime after Christmas 2023, Saclarides asked Cushman & Wakefield transaction specialist Jacquelyn Aaron to meet him for coffee. Aaron has worked at Cushman & Wakefield for seven years. She manages deals on behalf of Cushman & Wakefield from client engagement to close and she supported Saclarides and Bryan in their sales efforts.

---

[2] Available at https://www.walkerdunlop.com/news-and-events/2024-01-11-walker-dunlop-investment-sales-team-grows-north-carolina-platform-with-new-managing-director/ (last visited February 5, 2024).

48.     Saclarides and Aaron met on December 29th—the day he submitted his resignation. Saclarides told Aaron that a transaction management job would be posted by Walker & Dunlop for his new group the following Tuesday.

49.     When Aaron did not apply to the posting, on January 18th, she received an unsolicited call on her cellphone from an employee in human resources at Walker & Dunlop, Nancy Guffey. Guffey told Aaron that "Michael" had started a team at Walker & Dunlop and asked whether Aaron was interested in the transaction management job that had been posted. Guffey and Aaron discussed compensation and Guffey sent Aaron an email thanking her for her time and saying that she would be in touch.

50.     Because Aaron had no previous contact with Walker & Dunlop and because Saclarides had made her aware of the very position Ms. Guffey called about and to which Saclarides encouraged her to apply, upon information and belief, Saclarides supplied Aaron's cellphone number to Guffey and asked Guffey to call her.

51.     On the morning of December 29th, before his resignation, Saclarides called and texted senior graphic designer Stephanie Allison about a position at Walker & Dunlop. Allison has worked at Cushman & Wakefield for three years. She works with brokers and analysts to create sales presentations and marketing materials—including pitches and offer memorandums. Like Aaron, she supported Saclarides and Bryan in their sales efforts.

52.     When Saclarides spoke to Allison on December 29th, he told her that a graphic design position would be created for his new team at Walker & Dunlop and that she should look for the posting the following week. During the same call, Saclarides told Allison that he knew he should not be speaking with her about job openings at Walker & Dunlop.

53.     Immediately after the call, Saclarides sent Allison a text message asking her to keep their conversation confidential.

54.     Saclarides called Allison again about job openings at Walker & Dunlop on January 3rd. He told her that the transaction management position had been posted (for which he was trying to recruit Aaron) and the graphic design position would shortly be posted. Saclarides asked Allison about her salary and bonus structure and told her that he could "bonus [her] out" if she joined Walker & Dunlop.

55.     Allison subsequently saw the job posting for the graphic design position and chose not to apply.

56.     Upon information and belief, Bryan colluded with Saclarides to solicit Aaron and Allison and, also upon information and belief, Saclarides and/or Bryan have solicited other Cushman & Wakefield employees on behalf of Walker & Dunlop, in violation of their non-solicitation obligations.

57.     In fact, since Defendants' resignations, Caroline Piper, a Senior Financial Analyst who worked with Saclarides and Bryan at Cushman & Wakefield, resigned from the company and accepted a position at Walker & Dunlop that is similar to the one she had at Cushman & Wakefield. Piper has informed Cushman & Wakefield that Saclarides and Bryan recruited her for the position at Walker & Dunlop.

**(b)     Defendants' Theft of Cushman & Wakefield's Trade Secret and Confidential Information**

58.     On December 29th—again, the date of Defendants' resignations—Bryan connected a USB to his Cushman & Wakefield laptop and copied hundreds of files containing some of the company's most sensitive trade secret and confidential information. Among other things, the stolen materials include proprietary (i) underwriting models; (ii) pitch templates; (iii)

development pipelines for different markets; (iv) client lists containing confidential client information; (v) debt maturity information; (vi) pricing information; and (vii) financial statements.

59.     Cushman & Wakefield generates underwriting models and the other materials identified in ¶ 58, *supra*, through substantial time, effort and expense. Cushman & Wakefield uses the materials to secure a competitive edge in providing its commercial real estate investment advisory services.

60.     The materials identified in ¶ 58, *supra*, provide insight into Cushman & Wakefield's business operations and strategies—including, for example, how Cushman & Wakefield goes about obtaining new business, how it prices its services, and the proprietary analysis it uses to value deals. For that reason, the materials would be highly valuable to a competitor such as Walker & Dunlop. Indeed, a competitor in possession of the materials could use them to undercut Cushman & Wakefield in securing prospective business and anticipate what needs to be done to steal Cushman & Wakefield's existing business. For that reason, Cushman & Wakefield takes substantial steps to protect the materials and keep them confidential, *see* ¶¶ 17–19, *supra*.

61.     The scope of the materials Bryan took is staggering. Among other things:

a.      Bryan took more than 500 files containing information about several sizable assets belonging to Cushman & Wakefield **Client 1**. That includes compilation financial materials and transaction management templates that Cushman & Wakefield generated through its own internal research and development.

b.      Bryan also took underwriting and valuation materials prepared by Cushman & Wakefield relating to the assets of Client 1. The underwriting materials

contain a version of Cushman & Wakefield's proprietary underwriting model. A competitor in possession of the underwriting model would understand how Cushman & Wakefield prices its deals and could use that understanding to gain an advantage not just with respect to the assets of Client 1, but for other business opportunities as well.

c.      Client 1 is a large developer with a nationwide presence, and is a significant client of Cushman & Wakefield. The company has invested substantial resources over the years to grow its relationship with Client 1.

d.      Bryan also took materials relating to pitches and assets that Cushman & Wakefield is actively pursuing with other current clients and about which Saclarides and Bryan had firsthand knowledge as a result of their engagement with Cushman & Wakefield.

e.      For example, Bryan took confidential and proprietary marketing and underwriting materials relating to an asset that Cushman & Wakefield is pitching to **Client 2**. Saclarides pitched this asset to Client 2 in November 2023, while still engaged by Cushman & Wakefield.

f.      Bryan took confidential and proprietary underwriting material relating to another asset that Cushman & Wakefield has been discussing with **Client 3** for the last twelve months. Bryan and Saclarides were involved in some of those discussions prior to their resignations. The material Bryan took regarding this asset was compiled by Cushman & Wakefield as recently as December 21, 2023.

g.      Bryan took pitch materials, valuation summaries, and other financial documents prepared by Cushman & Wakefield in relation to an asset that Cushman &

16

Wakefield is actively pursuing for **Client 4**. Client 4 has not yet determined who it will hire for this particular deal.

h.      Bryan also took information pertaining to assets that Cushman & Wakefield is actively pursuing with prospective clients and about which Saclarides and Bryan had firsthand knowledge as a result of their engagement with Cushman & Wakefield.

i.      For example, after submitting a request for proposal ("RFP"), Cushman & Wakefield was selected among other competitors to pitch a deal relating to an asset belonging to **Client 5**. The pitch is taking place in the imminent future. Bryan took the RFP, pitch materials, and underwriting materials for this deal.

62.     Upon information and belief, Saclarides colluded with Bryan to take files from Cushman & Wakefield and with respect to *which* files to target—*i.e.*, the files that would be most useful to Saclarides and Bryan in jumpstarting their new engagement with Walker & Dunlop. Indeed, all of the files that Bryan surreptitiously copied pertain to current or prospective clients with whom Saclarides and Bryan had contact on behalf of Cushman & Wakefield in the twelve months prior to their resignations (including, of course, Client 1, Client 2, Client 3, Client 4, and Client 5).

**(c)      Defendants' Solicitation of Cushman & Wakefield's Clients**

63.     Having armed themselves with hundreds of files containing Cushman & Wakefield's trade secret and confidential information, Saclarides and Bryan set out to steal Cushman & Wakefield's clients.

64.     Client 2, Client 3, Client 4, and Client 5 each reported to Cushman & Wakefield that Defendants contacted the clients after Defendants' resignations from Cushman & Wakefield

in order to discuss the **same opportunities** identified in ¶ 61(e)–(i), *supra*—but this time on behalf of Walker & Dunlop.

65.     In fact, Client 2 reported that when Saclarides pitched the opportunity in November 2023—when Saclarides was still engaged by Cushman & Wakefield—Client 2 **already knew** that Saclarides was going to Walker & Dunlop and that the pitch was really for Walker & Dunlop, not Cushman & Wakefield.

66.     Defendants' actions in copying client files on the day of their resignations, when they had already accepted positions with Walker & Dunlop, and immediately soliciting the same clients, on the same deals, on behalf of Walker & Dunlop permits only one reasonable inference: Saclarides and Bryan are using Cushman & Wakefield's trade secret and confidential information to compete against it.

67.     Upon information and belief, Saclarides and Bryan have solicited other clients of Cushman & Wakefield on behalf of Walker & Dunlop, in violation of their contractual obligations.

**E.     Cushman & Wakefield's Actions To Enforce Its Contractual Rights**

68.     On January 18, 2024, Cushman & Wakefield sent cease and desists letters to Saclarides and Bryan seeking assurances that they would abide by their contractual obligations— including their obligation to return materials belonging to the company.

69.     Cushman also sent a letter to Walker & Dunlop alerting Walker & Dunlop of Saclarides' and Bryan's contractual obligations, to the extent it was not already aware.

70.     The January 18th letters demanded assurances that Saclarides and Bryan have not attempted to solicit Cushman & Wakefield clients or employees.

71.     Gray later received a text message from Saclarides claiming ignorance as to what prompted Cushman & Wakefield to send a cease and desist letter. Saclarides and Bryan have not otherwise responded to the letters (or returned the stolen files).

72.     On January 26th, Walker & Dunlop sent a letter in response. It claimed to have uncovered no evidence of Saclarides violating his contractual obligations. That is inconsistent with information provided by Cushman & Wakefield's clients and employees confirming that Saclarides solicited them and/or coordinated with Walker & Dunlop to solicit them. In its letter, Walker & Dunlop did not purport to have conducted an investigation with respect to the conduct of Bryan.

73.     Defendants are actively soliciting Cushman & Wakefield's employees and clients and using Cushman & Wakefield's trade secret and confidential information to compete against it, all in violation of Cushman & Wakefield's contractual and statutory rights. As a result of Defendants' ongoing unfair competition and misconduct, Cushman & Wakefield stands to suffer substantial lost business. The value of Cushman & Wakefield's goodwill, customer relationships, employee relationships, trade secrets and confidential information is also at significant risk. Preliminary and permanent injunctive relief is necessary to prevent ongoing and irreparable harm to Cushman & Wakefield.

## COUNT I
## Breach of Contract—Broker Agreements
## (Saclarides and Bryan)

74.     Cushman & Wakefield repeats and re-alleges the allegations contained in Paragraphs 1–73 as if fully set forth herein.

75.     Cushman & Wakefield and Saclarides entered into a valid and enforceable agreement in the form of the Saclarides Broker Agreement.

76.     Cushman & Wakefield and Bryan entered into a valid and enforceable agreement in the form of the Bryan Broker Agreement.

77.     Under the Policy incorporated by reference in the Broker Agreements, Saclarides and Bryan agreed not to solicit Cushman & Wakefield clients or referral sources for a prior of twelve months following the termination of their respective engagements, under the terms set forth in ¶¶ 25–28, 36–37, *supra*.

78.     Under the Policy incorporated by reference in the Broker Agreements, Saclarides and Bryan agreed not to solicit Cushman & Wakefield employees for a prior of twelve months following the termination of their respective engagements, under the terms set forth in ¶¶ 29, 36–37, *supra*.

79.     Under the Policy incorporated by reference in the Broker Agreements, Saclarides and Bryan agreed not to disclose trade secret and confidential information belonging to Cushman & Wakefield and not to use such information other than in the performance of their duties for Cushman & Wakefield, under the terms set forth in ¶¶ 31–32, 38, *supra*.

80.     Under the Broker Agreements and Policy incorporated by reference in the Broker Agreements, Saclarides and Bryan are obligated to return all such trade secret and confidential information upon the termination of their engagement, under the terms set forth in ¶¶ 31–32, 38, *supra*.

81.     The promises made by Saclarides and Bryan were material terms to the Broker Agreements that they entered into with Cushman & Wakefield, which were executed by Saclarides and Bryan in exchange for good and valuable consideration.

82.     Saclarides and Bryan breached their ongoing obligations under the Broker Agreements by:

    a.   Soliciting Cushman & Wakefield clients and referral sources on behalf of Walker & Dunlop, a direct competitor of Cushman & Wakefield in the multifamily real estate investment services sector;

    b.   Upon information and belief, colluding to take materials containing trade secret and confidential information belonging to Cushman & Wakefield, as described in ¶¶ 58–62;

    c.   Failing to return the materials; and

    d.   Upon information and belief, disclosing the materials to Walker & Dunlop and using the materials to compete against Cushman & Wakefield.

    e.   Soliciting Cushman & Wakefield employees, also on behalf of Walker & Dunlop.

83.    As a further result of this breach, Cushman & Wakefield has suffered and continues to suffer damages and irreparable harm, including, but not limited to, the loss of business, loss of goodwill, and other damages for which there is no adequate remedy at law.

## COUNT II

### Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1832, *et seq.* (Saclarides and Bryan)

84.    Cushman & Wakefield repeats and realleges the allegations in Paragraphs 1–83 as if fully set forth herein.

85.    The Defend Trade Secrets Act defines "trade secret" to include all forms and types of financial, business or economic information—including plans, compilations, methods, techniques, processes, procedures or programs—(a) the owner of the information has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known or readily

ascertainable through independent development by persons who can obtain economic value from its disclosure or use. *See* 18 U.S.C. § 1839(3).

86.     Saclarides and Bryan obtained Cushman & Wakefield's trade secrets by improper means and without authorization. Bryan attached a USB to his Cushman & Wakefield laptop on the day of Defendants' resignation and copied materials containing trade secret information. Upon information and belief, Saclarides colluded with Bryan to take the materials and with respect to *which* materials would inflict the most competitive damage on Cushman & Wakefield.

87.     Saclarides' and Bryan's nefarious intent in conspiring to take these files is evidenced by, among other things, Bryan's theft of the files on the same date as Defendants' resignations; Bryan's false assurance to Cushman & Wakefield management that he would not take company files; Saclarides' and Bryan's failure to return the files in violation of their contractual obligations to Cushman & Wakefield; and the fact that the files relate to the same clients Saclarides and Bryan solicited on behalf of Walker & Dunlop prior to and after their resignation from Cushman & Wakefield.

88.     The materials Saclarides and Bryan misappropriated include, among other things, proprietary (i) underwriting models; (ii) pitch templates; (iii) development pipelines for different markets; (iv) client lists containing confidential client information; (v) debt maturity information; (vi) pricing information; and (vii) financial statements. Such materials derive independent economic value from not being generally known to, and not readily ascertainable through proper means by, competitors of Cushman & Wakefield or other persons or entities who might obtain economic value from disclosure or use of the materials. Some or all of these materials relate to services that are sold in interstate commerce.

89.     Cushman & Wakefield makes a substantial effort to protect the secrecy of the materials that Saclarides and Bryan misappropriated. Indeed, it was only by violating their contractual obligations to Cushman & Wakefield that Saclarides and Bryan were able to retain and use the materials.

90.     Saclarides and Bryan knew or should have known that Cushman & Wakefield's trade secrets (a) are confidential; (b) were acquired under circumstances giving rise to a duty to maintain their confidentiality; (c) were developed or acquired by Cushman & Wakefield at great expense and effort; (d) are maintained as confidential and not generally available to the public or Cushman & Wakefield's competitors; (e) would provide significant benefit to a competitor; and (f) are critical to Cushman & Wakefield's commercial success.

91.     Upon information and belief, Saclarides and Bryan have disclosed Cushman & Wakefield's trade secrets to Walker & Dunlop and are using the trade secrets to compete against Cushman & Wakefield on behalf of Walker & Dunlop.

92.     By improperly retaining and disclosing and/or threatening to disclose Cushman & Wakefield's trade secrets to Walker & Dunlop, Saclarides and Bryan have misappropriated and threaten to continue to misappropriate Cushman & Wakefield's trade secrets in violation of the Defend Trade Secrets Act.

93.     Should Saclarides and Bryan continue to disclose or threaten to disclose Cushman & Wakefield's trade secrets, the legitimate business interests of the Cushman & Wakefield will be significantly harmed. Indeed, if information pertaining to Cushman & Wakefield's trade secrets is disclosed to Walker & Dunlop or other competitors of Cushman & Wakefield, it could destroy Cushman & Wakefield's competitive advantage.

94.     Because Saclarides' and Bryan's misconduct is ongoing and poses a threat of significant irreparable harm that cannot be compensated by money alone, Cushman & Wakefield is entitled to preliminary and permanent injunctive relief against Saclarides and Bryan from actual or threatened disclosure or use of Cushman & Wakefield's trade secrets.

**COUNT III**

**Violation of the North Carolina Trade Secrets
Protection Act, N.C. Gen Stat § 66–152
(Saclarides and Bryan)**

95.     Cushman & Wakefield repeats and realleges the allegations in Paragraphs 1–94 as if fully set forth herein.

96.     The North Carolina Trade Secrets Protection Act defines "trade secret" to include business information—including formulas, programs, compilations of information, methods, and processes—provided that (a) the owner of the information has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use. *See* N.C. Gen. Stat. § 66–152(3).

97.     The files that Bryan copied from Cushman & Wakefield on the day of Defendants' resignations, in collusion with Saclarides, contain trade secrets under the North Carolina Trade Secrets Protection Act.

98.     Saclarides and Bryan knew or should have known that the copied files contain trade secrets.

99.     Regardless, Saclarides and Bryan acquired, disclosed, and used the copied files without express and implied authority and consent from Cushman & Wakefield. Neither

Saclarides nor Bryan arrived at the protected information in the copied files by independent development, reverse engineering, or obtained the information with a right to disclose the information.

100.    Saclarides and Bryan's actions, as set forth herein, constitute "misappropriation" within the meaning of the North Carolina Trade Secrets Protection Act. *See* N.C. Gen. Stat. § 66–152(1).

101.    Saclarides and Bryan have been or will be unjustly enriched by the misappropriation of Cushman & Wakefield's trade secrets. Unless restrained, Saclarides and Bryan will continue to threaten to use or disclose, or actually use or disclose, Cushman & Wakefield's trade secrets.

102.    As a result of Defendants' misappropriation of its trade secrets, Cushman & Wakefield has already been injured and faces further irreparable injury.

103.    Saclarides' and Bryan's actions in misappropriating Cushman & Wakefield's trade secrets were willful and malicious and were done in bad faith, in order to injure and oppress Cushman & Wakefield and improve Saclarides' and Bryan's own economic opportunities.

## **PRAYER FOR RELIEF**

WHEREFORE, Cushman & Wakefield prays for judgment in Cushman & Wakefield's favor on all counts against Saclarides and Bryan, jointly and severally, as follows:

1.    For a temporary restraining order, a preliminary injunction, and a permanent injunction restraining and enjoining Saclarides and Bryan, including their agents, servants, employees, attorneys, and those persons in active concert or participation with them, from the following:

a.      Soliciting or otherwise interfering with the business or patronage of any Active Client or Referral Source with whom they had contact or about whom they learned of through Confidential Information during the last twenty-four (24) months of their engagement with Cushman & Wakefield, including soliciting business from any Active Client or Referral Source that has existing or pending transactions or assignments with Cushman & Wakefield or any its affiliates or soliciting, or encouraging such Active Clients to discontinue or reduce their existing or pending transactions or assignments with Cushman & Wakefield or reduce their consideration of Cushman & Wakefield for pending transactions or assignments, personally or as or as an employee, stockholder, director, investor, owner, consultant, manager, member, associate, partner, agent, independent contractor, or otherwise, or by means of any corporate or other device;

b.      Soliciting or encouraging any employee or independent contractor engaged by Cushman & Wakefield to terminate their engagement/employment with Cushman & Wakefield;

c.      Obtaining, accessing, using, possessing, retaining, transmitting, copying, or disclosing any Cushman & Wakefield confidential, proprietary, or trade secret information, including but not limited to financial, marketing, and business information, regardless of whether contained in a data storage device, data storage account, or otherwise, and specifically the Cushman & Wakefield files that Bryan copied to a USB from his Cushman & Wakefield laptop on December 29, 2023;

d.      Deleting, destroying, altering, or erasing any evidence relating to this action, including but not limited to any hard or electronic copies of any Cushman & Wakefield confidential, proprietary, or trade secret information Saclarides or Bryan

26

copied, accessed, or took from Cushman & Wakefield, or any computers, data storage devices, or accounts used to access or retain such information;

2.      For an Order that, within two (2) business days of the issuance of the Order, Saclarides and Bryan shall:

          a.      Return to Cushman & Wakefield all information, documents, and tangible things in their possession, custody, or control, whether in physical or digital format, including any and all copies thereof, that contain Cushman & Wakefield confidential, proprietary, or trade secret information, including specifically the USB device upon which Bryan copied Cushman & Wakefield files on December 29, 2023, which shall be subjected to a forensic inspection by an independent third party vendor to be engaged by counsel for Cushman & Wakefield;

          b.      Identify and provide access to an independent third-party vendor all data storage devices, data storage accounts, email accounts, local drives, shared drives, phones, tablets, or other computer systems from which Saclarides or Bryan accessed or used Cushman & Wakefield confidential, proprietary, or trade secret information, so that the vendor may catalog any such information and otherwise preserve evidence for this litigation and remove any such Cushman & Wakefield information from Saclarides' or Bryan's possession;

3.      For an Order that Saclarides and Bryan shall immediately (a) identify any person or entity to whom Saclarides or Bryan disclosed or provided any copy of all or any part of Cushman & Wakefield confidential, proprietary, or trade secret information; and (b) put them on notice not to use and to return to Cushman & Wakefield any such information;

4.      For an Order showing an accounting of monies obtained through Saclarides or Bryan's wrongful acts;

5.      For an Order of disgorgement of the monies obtained through wrongful acts;

6.      For lost profits of Cushman & Wakefield as a result of Saclarides' or Bryan's wrongful acts;

7.      For compensatory damages in an amount to be shown at trial;

8.      For exemplary damages of twice the amount award as general damages for Count II for misappropriation of trade secrets;

9.      For Cushman & Wakefield's actual costs, expenses, and reasonable attorney's fees, including all related costs and expenses, incurred by Cushman & Wakefield in connection with this action;

10.     For pre- and post- judgment interest;

11.     For any other and further relief as provided for by contract, statute, or law, or that this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Cushman & Wakefield demands trial by jury on all claims and issues so triable.

Dated: New York, New York
February 7, 2024

KELLEY DRYE & WARREN LLP

By: /s/ Blythe E. Lovinger
Blythe E. Lovinger
Robert I. Steiner
Elizabeth N. Krasnow
Alison Frimmel
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Tel. (212) 808-7800
blovinger@kelleydrye.com
rsteiner@kelleydrye.com
ekrasnow@kelleydrye.com
afrimmel@kelleydrye.com

*Attorneys for Plaintiff*